## Case No. 10,600.

OSCANYAN v. WINCHESTER REPEATING ARMS CO.

[15 Blatchf. 79; 17 Am. Law Reg. (N. S.) 626; 13 Am. Law Rev. 161.] [1]

Circuit Court, S. D. New York. July 16, 1878. [2]

CONTRACTS—VOID AS AGAINST PUBLIC POLICY— PLEA OF THE GENERAL ISSUE.

1. R., an agent of the Turkish government, came to the United States to buy fire-arms for that government. O., the consul-general for that government, in New York, procured from R. orders for W. to make such fire-arms, and W. agreed to pay O. a commission on the amount of such orders. W. furnished the fire-arms. O. then sued W. to recover the amount of the commission: *Held*, that the agreement was void, because against public policy, and that no action upon it would lie.

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission. 13 Am. Law Rev. 161, contains only a partial report.]

[2] [Affirmed in 103 U. S. 261.]

2. The agreement was a purchase and sale of the official influence of O.

3. Such a defence can be set up under a plea of the general issue.

[Action at law by Christopher Oscanyan against the Winchester Repeating Arms Company.]

Theodore W. Dwight, Richard O'Gorman, and Herman H. Shook, for plaintiff.

Francis N. Bangs and Edmund R. Robinson, for defendant.

SHIPMAN, District Judge. This is an action of assumpsit to recover from the defendant $136,000, the same being commissions which, it is alleged, the defendant agreed to pay to the plaintiff for his services in effecting the sale of fire-arms to the Turkish government, amounting in all to $1,360,000. The plaintiff's counsel, in his opening statement to the jury, has stated the facts upon which he relies, and which facts, it is conceded, the plaintiff offers to prove and claims to be true. Assuming that such facts are true, the defendant moves, according to the practice in this circuit, for a verdict for the defendant, or for a dismissal of the suit, upon the ground that the plaintiff has no legal and valid cause of action, upon his own showing.

The facts which, for the purpose of the decision, it is necessary to recite, are as follows: The plaintiff is an Armenian Turk, who has long resided in this country, and is a person of education, ability and literary accomplishments. In the years 1869 and 1870, he was consul-general for the Ottoman government in the city of New York. The office had no fixed salary, but the incumbent had the right to receive certain fees for clearances of Turkish vessels. or vessels bound for Turkey. The duties of the office are not stated, except so far as can be inferred from the title. It is certain, however, that the plaintiff was in some sort the representative of the Turkish government in this city, and was an acknowledged official of that empire. In 1869, the Turkish government sent Rustan Bey to this country to purchase arms and ammunition, or to examine various arms, and to report upon and recommend those which he should approve, to the proper authorities in Turkey. Rustan Bey did not speak the English language, but was acquainted with French. He was an old acquaintance of the plaintiff, and, while in this city, made the plaintiff's office his headquarters. As the plaintiff was well versed in the English language, all the business pertaining to the selection of arms was transacted by Rustan Bey through the plaintiff. The defendant was and is a corporation established in Connecticut, for the manufacture of fire-arms, of which corporation Mr. O. F. Winchester was, at the time of these transactions, the president. In 1870, the plaintiff and Mr. Winchester met each other at the store of Schuyler, Hartley and Graham, when Mr. Winchester sought an introduction to the plaintiff, through one of the members of their firm, and asked the plaintiff to call Rustan Bey's attention to the defendant's repeating rifle. The plaintiff replied that he had a commission on all business or sales which were effected through his instrumentality. Winchester replied: "We will make that right, and agree upon the amount," or words to that effect. The weapon was exhibited by Mr. Oscanyan to Rustan Bey, who did not like it. The plaintiff afterwards informed Mr. Winchester of this fact, but said that he thought he could induce Rustan Bey to include the Winchester arm among other samples which he was to forward to Turkey. This was done. In January, 1870, Rustan Bey received instructions from the sultan to examine and report upon the Spencer rifle, an arm which had been manufactured in this country. The reason for giving this order was, that the sultan had heard that a quantity of these guns were owned by, and were to be sold by, the United States government. The plaintiff thereupon used all his influence (which is represented to have been great) with Rustan Bey to have the Spencer gun discarded, and also used all his influence to have Rustan Bey examine the Winchester gun. The Turkish officer still did not like the arm; but, finally, the plaintiff succeeded in obtaining from him an order for 1,000 guns. This order Rustan Bey gave in order to please the plaintiff, who, he knew, was getting a commission, and furthermore, in his report, condemned the Spencer gun. Mr. Winchester and the plaintiff subsequently met, and Mr. Winchester was informed that the plaintiff had succeeded in getting the Spencer gun to be condemned, to which Winchester replied: "Why did you do that? I could have furnished you commissions upon sale of that gun." The plaintiff replied: "Why, the Turkish government could have bought of the United States government." The Turkish government thereafter invited proposals for the sale of 20,000 Winchester rifles, and ordered fresh samples. Mr. Winchester was informed by the plaintiff of this direction, and that he had got an order for 20,000 guns, and could get an order for 100,000 more. In this conversation, Winchester was also informed of an objection which the Turkish government made to the spring of the magazine, and was urged to meet and overcome the objection. At the same interview the plaintiff asked Winchester to put their agreement, in regard to commissions, in writing, which was done. The agreement, which was dated March 4th, 1870, is in the following words: "New Haven, Conn., March 4th, 1870. Oscanyan, Ottoman Consul-General—My Dear Sir: In accordance with my promise, I now proceed to put in writing the agreement or promise I made to you, namely: I hereby promise to pay to you a commission of ten per cent. upon all sales of arms

of our company made to or by you to the Ottoman government, provided only that such sale is made at prices and upon terms that shall first have our approbation, or be authorized by me. I am, very truly, yours, O. F. Winchester, Pres. W. R. Arms Co." Subsequently, Mr. Winchester informed the plaintiff how the objection in regard to the spring could be avoided, and that it was in fact without foundation. On March 5th, 1870, (Rustan Bey having forwarded his report to the Turkish government,) a fresh box of samples was sent to Harid Pasha, the Turkish minister of ordnance at Constantinople. This box arrived at Constantinople April 18th, 1870, and was taken to the palace of the sultan, who issued his order that 20,000 guns should be purchased, subject to trial of the samples. Harid Pasha received the order, and informed the sultan that no trial could be made, as no cartridges had been sent. These had not been shipped on account of a statute of the United States which prohibited shipping ammunition on ocean steamers. This information was returned to this country, and Winchester endeavored to overcome the difficulty by telegraphing that he would send cartridges from Berne, Switzerland, where he had a factory or depot of supplies. The cartridges were not in fact sent. Rustan Bey became excited, as he had condemned the Spencer gun through the plaintiff's influence, and he feared a reprimand from the Turkish government. The plaintiff endeavored to appease him, and went to Winchester, who then said that there were no cartridges in Berne. The plaintiff returned to Rustan Bey, who became enraged, and said that he never liked Winchester's looks, but was mollified by Oscanyan. Finally, it was agreed, at the plaintiff's suggestion, that cartridges should be sent to Turkey in a sailing vessel. They were furnished by the defendant and were so sent. The trial was had in Constantinople on July 3d, 1870, with a favorable result. Many facts were stated in regard to an attempted revocation by the defendant of the contract with the plaintiff, and the attempts of a Boston firm to make sales of the defendant's arm to the Turkish government, and to obtain commissions from the defendant, all which are unimportant in the aspect of the case which is presented by this motion. On November 9th, 1870, a written contract was entered into by the defendant with the Turkish government, for arms to the amount of $530,000; and, on August 19th, 1871, another contract was entered into for the purchase of arms from the defendant to the amount of $840,000. The plaintiff claims that the procuring cause of these contracts was the recommendation of Rustan Bey, which recommendation was obtained from him through the influence of the plaintiff. The defendant's counsel now moves for a verdict, upon the ground that the alleged contract with the plaintiff for the payment of commissions to

him upon sales made to the government of which he was an officer and trusted adviser, by the exercise and through the means of his great influence with the purchasing agent of that government, is void, as being a contract which is corrupt in itself, and which is prohibited by morality and public policy.

The character of the services which the plaintiff rendered, and the source or cause of their efficiency in obtaining for this arm the favor of Rustan Bey and the large orders of the Turkish government, has been so boldly and clearly stated by the plaintiff's counsel, that the case is freed from all disguise. The contract between the plaintiff and the defendant was a purchase and sale of the plaintiff's official influence as an officer of the Turkish government, and as the manager of the business transactions of Rustan Bey with American manufacturers, and a purchase and sale of the personal influence of the plaintiff over Rustan Bey, who was a stranger to our language and upon our soil, and the transaction was an active and controlling exercise of the influence, for the benefit of the defendant, in causing the rejection of arms, the purchase of which it was supposed would not enure to the defendant's benefit, and in causing the purchase of the defendant's arms by the Turkish government. The plaintiff states, through his counsel, that he caused the rejection of the Spencer rifle, which the sultan was disposed to look upon with favor, because the plaintiff supposed that the purchase of this arm would be of no pecuniary benefit to the defendant, and that he caused the purchase of the Winchester rifle to an immense amount, because he was thereby hoping to earn large commissions, and because such a purchase would enure greatly to the benefit of the defendant. The benefits which would enure to the government of which he was the commercial representative in this city, do not seem to have entered into the considerations which influenced his mind. It is true that the plaintiff was not the purchasing agent of the Turkish government, but he was its agent and one upon whom the purchasing agent relied. He was a public officer of the government of Turkey. In delivering the opinion of the supreme court, in Trist v. Child, 21 Wall. [88 U. S.] 441, Mr. Justice Swayne remarks: "The theory of our government is, that all public stations are trusts, and that those clothed with them are to be animated, in the discharge of their duties, solely by considerations of right, justice and the public good. They are never to descend to a lower plane." I am not aware that Turkey has laid down any different rule for the guidance of the persons whom it has charged with the exercise of public trusts upon foreign soil.

It is virtually conceded, that, if such a contract had been entered into by an official of the United States, in regard to commissions upon the sale of supplies which might be ef-

fected through his influence or exertions with our own government, whether that official was the purchasing agent or not, such a contract would be against public policy. The concession of the counsel is also found in the opinion in Tool Company v. Norris, 2 Wall. [69 U. S.] 45, in which Mr. Justice Field says: "All agreements for pecuniary considerations to control the business operations of the government, * * * are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country." But it is said that this is the law to be observed by public officers in this country, and to be administered by the courts of this country, and it does not follow that it is a rule which is to be enforced by our courts upon foreign officers, in regard to their dealings with foreign governments. The principle to which I have adverted, in regard to contracts for the use of official influence, is not found in a local statute; it is not peculiar to this country; it is a principle of morality and of public policy enforced in all countries which have a thoroughly organized system of law, and there is no presumption that it is contrary to the law of Turkey.

Again, the contract was entered into in this city, by a resident of this city, with a citizen of Connecticut. "Matters bearing upon the execution, the interpretation and the validity of a contract, are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance." Scudder v. Union Nat. Bank, 91 U. S. 406. Furthermore, it is sought to be enforced in our courts. Not only is it true that such a contract is against public policy, but its enforcement by a court of justice is against public policy. Quoting again from the opinion of Mr. Justice Swayne in Trist v. Child: "It is a rule of the common law, of universal application, that, when a contract, express or implied, is tainted with either of the vices last named," (i. e., because it is contrary to a constitution or statute, or inconsistent with sound policy and good morals), "as to the consideration, or the thing to be done, no alleged right, founded upon it, can be enforced in a court of justice."

It is not material that the plaintiff was permitted to enter into mercantile business by his government, nor is it material that his office was not a salaried one, nor that Rustan Bey was aware that the plaintiff was acting in the expectation of commissions. Rustan Bey was not authorized to condone any acts of the plaintiff. Neither do I think it important that the Turkish government was aware that the plaintiff was in the receipt of commissions, for, as has been said, the courts of this country are not organized to enforce contracts which are repugnant to the principles upon which courts are founded.

It is strongly urged by the plaintiff, that, since the passage of the act known as the practice act, approved June 1, 1872 (17 Stat. 197), and embodied in sections 914, 915, and 916 of the Revised Statutes of the United States, the pleadings in civil causes, in the circuit and district courts, must conform as near as may be to the pleadings existing at the time, in like causes in the courts of record of the state within which such circuit or district court is held, and that, by the Code of Procedure of the state of New York, the answer must set out specifically the grounds of defence which are relied upon, and that illegality of consideration must be specially set forth, and that the alleged invalidity of this contract is exclusively a matter of defence, and, if neglected or waived by the defendant, is not to be regarded by this court. The plea in this case, being the general issue, was filed at the October term, 1874. Prior to the act of June 1st, 1872, the common law system of process and pleading existed in this court, and immediately thereafter, as a matter of fact, the system was not substantially and materially changed. Common law declarations were filed, and, if no objection was made thereto, the pleadings thereafter were conducted under the established common law rules. No authoritative decision was rendered discountenancing such system of pleading until the case of Lewis v. Gould [Case No. 8,324], decided in December, 1875. The present case was originally brought in a state court, and was commenced by a complaint. After it was removed to this court a new declaration in assumpsit was filed, in accordance with the existing usage, and the plea of the general issue was also filed. In the case of Lewis v. Gould [supra], it was held, that "the common law forms of pleading are no longer necessary in the United States courts within the state of New York, nor are they admissible, except as they may be deemed to be substantially a compliance with the requirements of the Code of Procedure of the state as to pleadings;" and in Bills v. New Orleans, etc., R. Co. [Case No. 1,409], it was also held, that when a complaint had been put in in the state court and the action had been removed to this court, no further pleading on the part of the plaintiff was necessary. At common law, prior to the new English rules, passed about the year 1833, the defendant could, under the general issue, in an action of assumpsit, safely rely upon the defence that the contract which was sued upon was illegal in its inception. 1 Chit. Pl. 476, 477; Gould, Pl. 330, 332; Steph. Pl. 162, note; Young v. Black, 7 Cranch [11 U. S.] 565; Craig v. Missouri, 4 Pet. [29 U. S.] 410; Andrews v. Pond, 13 Pet. [38 U. S.] 65; Wilt v. Ogden, 13 Johns. 56; Edson v. Weston, 7 Cow. 278; Young v. Rummell, 2 Hill, 478. If, under the decision of Lewis v. Gould, it

should now be held that the general issue was inadmissible, or, if admissible, did not permit the special matter of defence which is relied upon, yet the defendant, having pleaded without objection, under a system which was recognized as proper at the time when the plea was filed, should have the right to amend his plea, so as to have the benefit of a defence which goes to the merits, and is not merely technical in its character.

But, the question in regard to the disposition of this case does not depend upon rules of pleading. The plaintiff, in his opening statement, stated the facts which he claimed to be true, and upon which he should rely. It is not suggested that they were not stated truthfully. These facts satisfy me that the contract was contra bonos mores. Such an objection it is not possible for the defendant to waive. If he undertakes to waive or to disregard it, the duty of the court is still imperative, not to enforce a contract which the law regards as injurious to public morals and against public policy. Courts are not open for the enforcement of such contracts, and will not lend assistance for the recovery of claims founded thereon; and it is immaterial whether the defendant has or has not formally taken the objection. The defence is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim, ex dolo malo non oritur actio, is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation, in the most solemn form, to waive the objection, would be tainted with the vice of the original contract, and void for the same reason. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation." Coppell v. Hall, 7 Wall. [74 U. S.] 542.

Recurring now to the character of the contract, there is no conflict in regard to the important facts. Upon a given and ascertained state of facts, the validity or invalidity of a contract is a question of law. There is nothing for the jury to pass upon. Upon the validity of this contract, I do not think that there is a discrepancy between the law as expounded by the court of appeals of New York and by the United States supreme court. The cases of Lyon v. Mitchell [36 N. Y. 235, 682] and Cummins v. Barculo [4 Keyes (N. Y.) 514] are very far from validating such an agreement as is here sued upon.

In view of the decision in Tool Co. v. Norris, 2 Wall. [69 U. S.] 45, it is not important to ascertain what the precise duties of Mr. Os-

canyan, as consul-general, were. By virtue of his office, and by virtue of his position as an officer of the Turkish government here, and through his acquaintance with Rustan Bey, the plaintiff held close and confidential relations with that gentleman. He had an influence over him, and was trusted and esteemed by him. The plaintiff is now seeking to obtain payment for the exercise of his influence over a purchasing agent, which resulted in procuring a contract to furnish supplies to the government of which both were officers at the time of such contract. An agreement to pay for such services being void, the plaintiff has no cause of action, and the motion of the defendant is granted.

[This cause was carried by writ of error to the supreme court, where the judgment of this court was affirmed. 103 U. S. 261.]